

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

May 7, 2022

**BY ECF**

The Honorable Denise L. Cote
United States District Court
Southern District of New York
500 Pearl Street
New York, New York 10007

    Re:    *United States v. Elliot Smerling*, S1 21 Cr. 317 (DLC)

Dear Judge Cote:

    The Government respectfully submits this letter in advance of the sentencing of Elliot Smerling ("Smerling" or the "defendant") on May 13, 2022. Smerling was the mastermind of a years-long scheme to secure financing for a series of private equity funds (the "Funds") through fraud and deceit. By the time the scheme was uncovered, in February 2021, the defendant, through the Funds, owed approximately $80 million dollars to Silicon Valley Bank and approximately $54 million to Citizens Bank. As set forth in the Presentence Investigation Report ("PSR"), and in the plea agreement, the Guidelines range is 97 to 121 months' imprisonment. The Probation Office recommends a sentence of 72 months' imprisonment, while the defendant requests a below-Guidelines sentence, effectively time served. (*See* ECF No. 43 at 8-9). For the reasons set forth below, the Government respectfully submits that a sentence at the low end of the Guidelines range would be sufficient, but not greater necessary, to achieve the goals of sentencing.

**A.**    **Background**

    **1.**    **The Offense Conduct**

        a.    <u>JES Global Capital, GP/LP ("Fund I")</u>

    Beginning in or around 2013, Smerling formed his first of several private equity funds, "JES Global Capital LP" (hereinafter, "Fund I"),[1] with the alleged purpose of identifying and

---

[1] Each of the Funds discussed herein was incorporated as a limited partnership, *i.e.*, "JES Global Capital, LP" which held the assets of the Fund, with a separate LLC, "JES Global Capital, GP, LLC" that acted as the general partner/manager of the Fund. In the Fund formation documents and to potential lenders and investors, Smerling held himself out as the founder of both and the controlling stakeholder of the general partner LLC. This memorandum refers to the LP and the GP for each Fund in the aggregate as "Fund I," "Fund II," and "Fund III" for the sake of simplicity.

investing in small or mid-size, regional businesses that Fund I could develop and exit successfully. Smerling sought to raise capital for Fund I from both financial institutions and individual investors. In discussions with investors or potential lenders, he used a private placement memorandum ("PPM"), pitch deck, audited financials for Fund I, and subscription agreements for Fund I, which purported to reflect the capital commitments of Fund I's limited partners. Virtually all the material claims in these documents were false, including Fund I's portfolio companies (it had none); the identity of its third-party administrator (there was none); its auditor (same); and its committed capital. In general, the PPM and subscription agreements reflected $75 million in committed capital when, in fact, Fund I had just $2 million, which Smerling had pledged himself. The signatures on the subscription agreements, which purported to be executed by authorized representatives of prominent investors (individual and institutional), were forged.

Using these falsified documents, Smerling secured an $8 million-dollar, subscription-backed line of credit for Fund I. He also managed to secure at least three limited partners (individual investors he knew from the Miami area), each of whom invested a modest, six-figure amount in Fund I. Smerling drew approximately $500,000 on the line of credit and used the funds to pay a salary and expenses for himself, one of his limited partners (who worked for Fund I to identify potential investment opportunities), and an employee who handled office administration.

Fund I struggled to find targets for investment, however, and, by in or around 2014, two of the individual investors in Fund I wanted Smerling to call capital from Fund I's (purported) limited partners to expand the search for opportunities. Rather than disclose that the capital commitments did not exist, Smerling abruptly shuttered Fund I, repaid the balance of the $8 million dollar loan, and repaid the individual investors.

Although the victims of Fund I—the bank and the individual investors—were ultimately made whole, the deceptive means that the defendant used market, promote, and secure financing for Fund I established the template for the defendant's fraudulent business practices that would persist until February 2021.

      b.   JES Global Capital GP/LP ("Fund II")

Beginning in or around 2018, Smerling approached Citizens Bank to apply for a revolving line of credit for a second private equity fund, "JES Global Capital II, LP" ("Fund II"). As with Fund I, Smerling represented that Fund II was successful: he submitted documents that reflected that Fund II had more than a dozen limited partners, whose capital commitments totaled approximately $200 million, and that all but four of the Fund II partners had also invested in Fund I, with capital commitments totaling approximately $80 million. (*See* Exhibit 1 at ¶¶ 18-19). These claims were false. Smerling had forged the signatures of the limited partners on the subscription agreements. (*Id.* at ¶ 20). Smerling's representations to Citizens Bank regarding its third-party administrator were false and an audit letter attesting to Fund II's finances had been fabricated. (*Id.* at ¶¶ 22-23). Smerling ultimately secured a $60 million dollar capital credit line from Citizens Bank, of which approximately $54 million of the principal remains outstanding. (*Id.* at ¶ 1).

      c.   JES Global Capital GP/LP III ("Fund III")

In or around December 1, 2020, Smerling approached Silicon Valley Bank seeking a $150 million subscription-backed line of credit for a third private equity fund he had formed, JES Global III ("Fund III"). (PSR ¶ 10; Exhibit 2 at ¶ 1). Smerling represented to Silicon Valley Bank that Fund III was a $500 million dollar fund with $50 million in capital on hand from its limited partners, as well as $450 million in additional capital committed by its limited partners pursuant to subscription agreements. Smerling also represented to Silicon Valley Bank that Fund III had an existing line of credit with another financial institution ("Bank-1"), from which approximately $100 million had been drawn, and that Fund III wanted to close that line of credit and open a similar line of credit with Silicon Valley Bank. (PSR ¶ 12-13; E0x. 2 at ¶ 17). In connection with his application, Smerling provided Silicon Valley Bank with, among other things, Fund III's financial statements, an audit letter, a capital table, and multiple subscription agreements and bank records purportedly reflecting the capital committed by Fund III's limited partners. (PSR ¶ 13). All had been materially falsified or forged. (PSR ¶¶ 14-15). In particular, the signatures on the subscription agreements, which included prominent institutional investors and home offices, had been forged and Smerling had falsified bank records that purported to reflect wire transfers from the limited partners to Fund III's accounts.

On or about February 3, 2021, Silicon Valley Bank extended the $150 million line of credit, secured by the purported $500 million in capital commitments to Fund III. Smerling immediate drew down approximately $95 million, which was paid to Bank-1 to close out the prior line of credit. (Ex. 2 ¶ 40). In the post-close diligence process that followed, Silicon Valley Bank began to question the authenticity of the documentation submitted by Smerling and contacted the Government.

### 2. The Defendant's Arrest and Initial Charges

On February 26, 2021, the defendant was arrested in the Southern District of Florida and charged by complaint (the "Complaint") with committing wire fraud and aggravated identity theft, in violation of Title 18, United States Code, Section 1343 and 1028A. (*See* ECF No. 1). The Complaint charged Smerling with his fraudulent scheme to secure financing from Silicon Valley Bank. Logistical obstacles caused by the Covid-19 pandemic delayed Smerling's transfer to this District. On or about May 12, 2021, Smerling arrived in the Southern District of New York and was presented and arraigned before Judge Netburn. Also on May 12, 2021, a grand jury sitting in this District returned an indictment that charged Smerling with the same two counts set forth in the Complaint, as well as a third count, charging bank fraud, in violation of Title 18, United States Code, Section 1344, in connection with his scheme to defraud Silicon Valley Bank.

### 3. Civil Suits Against the Funds and Smerling

On or about March 24, 2021, Silicon Valley Bank filed suit against Fund III and Smerling alleging, among other things, fraud, breach of contract, and unjust enrichment, and seeking approximately $80 million in outstanding principal owed. (Ex. 2, ¶ 6). On or about May 14, 20221, after attempting and failing to recover payment from Fund II on its outstanding line of credit, Citizens Bank filed suit against Smerling and Fund II in the Southern District of Florida seeking approximately $54 million in outstanding principal owed. (*See* Ex. 1, ¶ 64). On or about July 2, 2021, the Citizens Bank action was transferred to this District, designated as a related case,

and on or about July 7, 2021, the Court ordered that a "dual receivership" on consent of the parties to oversee the recovery of assets to satisfy the judgements. (Ex. 3 at p. 3-4).

### 4. The Defendant's Attempted Cooperation

Shortly after his transfer to the Southern District of New York, Smerling indicated that he was willing to cooperate with the Government. The defendant met with the Government twice; one such proffer was also attended by the Securities Exchange Commission ("SEC"). During its meetings with the Government, Smerling admitted the conduct concerning Silicon Valley Bank and Citizens Bank, as well as conduct that pre-dated these victims, such as the conduct and victims concerning Fund I, which the Government had not yet independently discovered. Although Smerling was forthcoming, the Government ultimately concluded that Smerling's information did not rise to the level of "substantial assistance" under Title 18, United States Code, Section 3553(e) and Section 5K1.1 of the Guidelines.

With respect to his assets, the Government is not currently aware of any specific asset or asset class that Smerling did not disclose during his proffers with the Government. The Government continues to try to reconstruct the flow of funds and use of proceeds, however, and its investigation continues.

### 5. The Plea Agreement and the Guidelines Calculation

On February 8, 2022, the defendant pleaded guilty, pursuant to a plea agreement (the "Plea Agreement"), to a superseding information (the "Superseding Information"). The Superseding Information charged him in two counts with bank fraud and securities fraud, in violation of Title 18, United States Code, Section 1344; Title 15, United States Code, Section 78j(b) & 78ff; and Title 17, Code of Federal Regulations, Section 240.10b-5, in connection with his years-long scheme to secure financing from banks and investors—ostensibly for his Funds—through deceptive and fraudulent means.

The Plea Agreement and the PSR set forth the following calculation of the offense level under the United States Sentencing Guidelines:

(1) A base offense level of 7 pursuant to U.S.S.G. § 2B1.1(a)(1);
(2) A 24-level increase, pursuant to U.S.S.G. § 2B1.1(b)(1)(M), because the loss amount of $133,957,323.65 is more than $65,000,000, but less than $150,000,000;
(3) A two-level increase, pursuant to U.S.S.G. § 2B1.1(b)(17)(A), because the defendant derived more than $1,000,000 in gross receipts from two financial institutions; and
(4) A three-level decrease, pursuant to U.S.S.G. § 3E1.1(a) and (b), for acceptance of responsibility.

In accordance with the foregoing, the applicable Guidelines offense level is 33. The parties agree that Smerling has no prior convictions and, therefore, his Criminal History Category is I, yielding a Guidelines range of 97 to 121 months' imprisonment. (PSR ¶ 14). The PSR contains the same Guidelines calculation as that set forth in the Plea Agreement. (PSR ¶¶ 29-41).

As part of his Plea Agreement, Smerling is required to forfeit $133,957,323.65 in U.S. currency, representing proceeds traceable to the fraud that Smerling personally obtained as part of the scheme. The Court previously entered a consent preliminary order of forfeiture against Smerling in this amount. (ECF. No. 39).

**B.     Discussion**

    **1.     Applicable Law**

The Guidelines still provide important guidance to the Court following *United States v. Booker*, 543 U.S. 220 (2005), and *United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005). "[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range," which "should be the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007). The Guidelines range is thus "the lodestar" that "'anchor[s]'" the district court's discretion. *Molina-Martinez v. United States*, 136 S. Ct. 1338, 1345-46 (2016) (quoting *Peugh v. United States*, 133 S. Ct. 2072, 2087 (2013)).

After making the initial Guidelines calculation, a sentencing judge must consider the factors outlined in Title 18, United States Code, Section 3553(a): (1) "the nature and circumstances of the offense and the history and characteristics of the defendant," 18 U.S.C. § 3553(a)(1); (2) the four legitimate purposes of sentencing, as set forth below, *see id.* § 3553(a)(2); (3) "the kinds of sentences available," *id.* § 3553(a)(3); (4) the Guidelines range itself, *see id.* § 3553(a)(4); (5) any relevant policy statement by the Sentencing Commission, *see id.* § 3553(a)(5); (6) "the need to avoid unwarranted sentence disparities among defendants," *id.* § 3553(a)(6); and (7) "the need to provide restitution to any victims," *id.* § 3553(a)(7). *See Gall*, 552 U.S. at 50 & n.6.

In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
> (B) to afford adequate deterrence to criminal conduct;
> (C) to protect the public from further crimes of the defendant; and
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2). To the extent that a district court imposes a sentence outside the range recommended by the Guidelines, it must "consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (en banc) (quoting *Gall*, 552 U.S. at 50) (internal quotation marks omitted).

### 2.     A Sentence at the Low End of the Guidelines Range Is Appropriate

The Government respectfully submits that a sentence at the low end of the Guidelines range of 97 to 121 months' imprisonment would be fair and appropriate. In particular, the nature and circumstances of the offense, the need for adequate punishment, and the need for general deterrence—balanced against the defendant's early acceptance of responsibility—all justify such a sentence.

The offense was extraordinarily serious. It was brazen, sophisticated, and of long duration. Smerling rented office space for the Funds, hired administrative employees, took meetings, and otherwise tried to maintain the appearance of running a legitimate private equity fund. This was nothing more than a front: the Funds had no portfolio companies and virtually no assets other than the financing provided by the victim banks. Rather, Smerling used the funds to play the role of a successful financier with a luxurious lifestyle, including multiple homes, luxury vehicles, expensive watches, and global travel. Smerling also lost a significant portion of the funds provided by the victims—at least $40 million—to day trading losses in various brokerage accounts. The offense was not a momentary lapse of judgement or act of desperation; it was a calculated, greed-fueled, effort to deceive and defraud that lasted for years.

Second, the extraordinary losses caused by the offense reflect its seriousness and the need for adequate punishment: Silicon Valley Bank and Citizens Bank, together, have lost more than $133 million dollars. To date, the Receiver has only been able to recover approximately $16,329,200, net of fees. (Ex. 4, at 3-5). This modest recovery is not for lack of effort. The complexity of the defendant's finances and holdings—spread over at least 113 cash and investment accounts, more than twelve financial institutions, and at least five jurisdictions, including Swiss bank accounts held by offshore asset protection trusts organized under the law of the Cook Islands—cannot be overstated. These arrangements may be opaque, but they speak clearly to the defendant's intent, over many years, to hide and hoard the proceeds of the fraud. Any punishment imposed must account for the defendant's malign efforts to shield the ill-gotten gains from any recovery.

Third, a sentence at the low end of Guidelines Range is necessary for general deterrence. The legislative history of 18 U.S.C. § 3553 demonstrates that "Congress viewed deterrence as 'particularly important in the area of white-collar crime.'" *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) (citing S. Rep. No. 98-225, at 76 (1983), reprinted in 1984 U.S.C.C.A.N. 3182, 3259); *see also United States v. Mueffelman*, 470 F.3d 33, 40 (1st Cir. 2006)(deterrence of white-collar crime is "of central concern to Congress"). General deterrence is an important sentencing factor in fraud and white-collar cases because it is seen as effective. *Martin*, 455 F.3d at 1240 ("Because economic and fraud-based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence.") (quotation marks and citation omitted). A Guidelines sentence, even one at the low end, will signal to others who think that crimes against financial institutions are "victimless" that their conduct will be met with serious punishment.

To be sure, Smerling accepted responsibility early and without reservation, and proffered with the Government as soon as logistically feasible. His prompt acceptance of responsibility permitted the Government to conserve many resources that would otherwise have been used to

indict and prosecute him. And, to date, the Government has not (yet) identified assets that Smerling did not disclose in his proffers with the Government, although the Government's investigation into the defendant's use and dissipation of proceeds of the fraud continues. Notwithstanding these salutary factors, the Government cannot ignore that there remain significant gaps in the forensic accounting that Smerling, to date, has not credibly filled and the report of his tepid cooperation with the Receiver speaks volumes. (Ex. 4 at 9-11). These facts weigh heavily on the Government's sentencing recommendation.

**C. Conclusion**

Smerling orchestrated a multi-year scheme that defrauded his victims of approximately $133 million dollars, which he used to fund a lavish lifestyle for himself and those close to him. For all the foregoing reasons, including the defendant's acceptance of responsibility and attempts to cooperate, the Government respectfully submits that the defendant's conduct warrants a sentence at the low end of the Guidelines range of 97 to 121 months' imprisonment.

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney

By:

Timothy V. Capozzi
Jilan J. Kamal
Assistant United States Attorneys
(212) 637-2192/2404

cc:  Adriana Collado-Hudak, Esq.
    David Kubiliun, Esq.
    Guy A. Lewis, Esq.