

May 6, 2022


Honorable Denise L. Cote
United States District Judge
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, NY 10007-1312


Re:  *Victim Impact Statement of Silicon Valley Bank in connection with the sentencing of Elliot S. Smerling (Case No. 21-cr-00317-DLC)*

Dear Judge Cote:

I am the Head of Advisory Services at Silicon Valley Bank ("SVB").  I respectfully submit this Victim Impact Statement on behalf of SVB in connection with the sentencing of Elliot S. Smerling, scheduled for May 13, 2022.  As described below, the fraudulent and unlawful conduct of Smerling has inflicted substantial harm on SVB.  The harm and loss caused by Smerling remains unaddressed, unremedied and unrecompensed.

**Introduction**

In early 2021, Smerling misappropriated approximately $95 million in loan proceeds from SVB through false representations and the submission of false statements and forged documents.  At the time of Smerling's arrest in February 2021, nearly $80 million of the amount Smerling misappropriated from SVB remained unaccounted for.  Although SVB instituted civil proceedings against Smerling and a Receiver was appointed to marshal and preserve Smerling's assets, the Receiver has located only a fraction of the funds wrongfully obtained by Smerling from SVB and other victims.

As a result of Smerling's serious criminal conduct, SVB's substantial losses and Smerling's failure meaningfully to assist SVB in recovering those losses, SVB respectfully requests that the Court impose on Smerling the maximum sentence applicable.  The maximum sentence will send a strong signal concerning the wrongfulness of Smerling's conduct and his failure to return the funds he stole.  It also will deter others from engaging in similar unlawful conduct.  SVB also respectfully requests that the Court enter an order of restitution for the benefit of SVB in the amount of at least $87,293,191.59 plus continuing interest for the reasons set forth below.



**Overview of Smerling's Extensive Fraud on SVB**

A description of Smerling's fraud on SVB is set forth in detail in SVB's civil complaint in *In re Smerling Litigation*, No. 21-cv-2552 (S.D.N.Y.) (Cronan, J.) (the "Civil Action"), which is attached hereto as Exhibit A.  In the Civil Action, the Court entered judgment in favor of SVB and against Smerling in the amount of nearly $80 million plus interest.  (ECF No. 83.)

To summarize, in December 2020, Smerling contacted SVB, holding himself out to be the founder of JES Global Capital III, L.P. (the "JES Fund") and JES Global Capital GP III, LLC (the "JES GP"), the JES Fund's general partner (together with the JES Fund, the "JES Entities").  Smerling represented to SVB that the JES Fund was a legitimate private equity fund that had $500 million in capital commitments from prominent limited partners, including endowments for New York University and the University of Miami, and financial institutions such as Bank of New York Mellon, and that the JES Fund already had invested nearly $100 million in three portfolio companies.  These representations were false.  In reliance on these false representations, along with forged and falsified documents provided by Smerling, SVB agreed to issue a $150 million line of credit, of which nearly $95 million was immediately drawn down.

In reliance on the fraudulent documents and other false representations made by Smerling, SVB entered into a Loan and Security Agreement (the "Loan Agreement") with the JES Fund and JES GP, effective February 3, 2021. Under the Loan Agreement, SVB agreed to extend to the JES Fund a line of credit of up to $150 million, secured by the $500 million in capital commitments Smerling claimed had been made by the limited partners to the JES Fund. That same day, SVB wired $94,957,322.65, which was drawn down by the JES Fund pursuant to the Loan Agreement, to Sumitomo Mitsui Bank Corporation ("SMBC") at the direction of the JES Fund, purportedly to close out the JES Fund's prior line of credit with SMBC.

Shortly after execution of the Loan Agreement, SVB uncovered Smerling's fraud. On February 26, 2021, SVB sent Smerling and the JES Entities a notice declaring an Event of Default under the Loan Agreement based on Smerling's submission of forged and falsified information, and demanding immediate repayment of the amounts drawn down under the Loan Agreement.  SVB also alerted the U.S. Attorney's Office for the Southern District of New York (the "USAO"), and Smerling was subsequently arrested and charged with bank fraud and other crimes.

To date, the outstanding principal balance of $79,957,322.65, as well as additional interest, charges, fees and other obligations owing under the Loan Agreement, have not been repaid.

**SVB Has Incurred Significant Losses as a Result of Smerling's Fraud**

SVB has incurred approximately $87,293,191.59 in losses as a result of Smerling's fraud.  This figure is conservative because, as described further below, SVB has incurred certain costs that are unquantifiable and continues to incur costs as a result of Smerling's fraud.  Specifically:



*First*, SVB continues to be owed the outstanding loan balance of $79,957,322.65. It is also owed interest in the amount of approximately $5,170,304.38, consisting of pre-default interest of $197,168.42 and default interest of $1,259,327.52 under the Loan Agreement, and post-judgment interest of $3,713,808.44 pursuant to 28 U.S.C. § 1961 (from the date the consent judgment referenced above was entered against Smerling).

*Second*, SVB incurred and continues to incur substantial attorneys' fees and costs in connection with Smerling's fraud.  In particular, SVB incurred fees and costs in connection with:

- uncovering Smerling's fraud and reporting it to the USAO (which subsequently led to Smerling's indictment);

- pursuing civil proceedings against Smerling and the JES GP, which included sending document preservation requests, obtaining preliminary injunctions and attachment orders, and seeking third-party discovery, in an attempt to locate and preserve any evidence or proceeds of Smerling's fraud; and

- supporting and coordinating with the Receiver appointed in the Civil Action to locate the proceeds of Smerling's fraud.

In total, SVB has incurred approximately $2,165,564.56 of attorneys' fees and costs to date and expects to continue incurring attorneys' fees as the Receiver continues to attempt to locate the proceeds of Smerling's fraud.

*Third*, SVB has incurred substantial costs in the form of time expended by its personnel.  SVB estimates that its personnel have spent hundreds of hours since February 2021, among other things, uncovering Smerling's fraud, communicating with SVB's outside counsel regarding this action and the Civil Action, assisting law enforcement, and coordinating with the Receiver.

**Smerling has Failed to Meaningfully Assist in the Recovery of the Misappropriated Funds**

Since his arrest on February 26, 2021, Smerling has had numerous opportunities to assist in the recovery of the funds he misappropriated.  Smerling has failed to provide meaningful assistance.  We understand that during an interview of Smerling by the Receiver, Smerling claimed that he is not aware of any assets other than those already identified by the Receiver and that any money accounted for is likely due to payroll and operating expenses that the Receiver did not consider or underestimated.  We understand that the Receiver does not consider Smerling's position to be credible.  We further understand that the Receiver concluded that Smerling's explanation of various transactions that he engaged in is lacking in credibility.  In addition, we understand from the Receiver that Smerling sought to impose inappropriate conditions on his cooperation.



**Conclusion**

        Based on Smerling's fraudulent and unlawful conduct, SVB's substantial losses as a result of Smerling's unlawful conduct, as well as Smerling's failure to return the proceeds of his fraud, SVB respectfully submits that Smerling should be sentenced to the maximum sentence permissible.  SVB also respectfully requests that the Court enter a restitution order for the benefit of SVB in the amount of at least $87,293,191.59.

        Respectfully submitted,

DocuSigned by:

*Shawn Goozman*

46904569DD9E411...

Shawn Goozman

Enclosures


cc:    By Email

    Lorin L. Reisner, Esq.
    Allan J. Arffa, Esq.
    Susanna M. Buergel, Esq.
    Kristina A. Bunting, Esq.
    Paul, Weiss, Rifkind, Wharton & Garrison LLP
    1285 Avenue of the Americas
    New York, NY 10019
    lreisner@paulweiss.com
    aarffa@paulweiss.com
    sbuergel@paulweiss.com
    kbunting@paulweiss.com

    Jilan J. Kamal, Esq.
    Timothy V. Capozzi, Esq.
    U.S. Attorney's Office for the Southern District of New York
    One Saint Andrews Plaza
    New York, NY 10007
    Jilan.kamal@usdoj.gov
    Timothy.capozzi@usdoj.gov

    James S. Feltman
    c/o Paul Singerman, Esq.
    Berger Singerman LLP
    1450 Brickell Avenue, Suite 1900
    Miami, FL 33131
    singerman@bergersingerman.com

# EXHIBIT A

## UNITED STATES DISTRICT COURT FOR
## THE SOUTHERN DISTRICT OF NEW YORK

SILICON VALLEY BANK,

                  Plaintiff,

    vs.

JES GLOBAL CAPITAL GP III, LLC; and
ELLIOT S. SMERLING,

                  Defendants.

2021 Civ. _____

**<u>JURY TRIAL DEMANDED</u>**

## <u>COMPLAINT</u>

Plaintiff, by its undersigned attorneys, alleges the following upon knowledge as to its own acts and upon the investigation of counsel, which investigation included the examination and analysis of information obtained from public and proprietary sources.

## <u>NATURE OF THE ACTION</u>

1.     This is an action to recover nearly $95 million that was misappropriated from Plaintiff Silicon Valley Bank ("SVB") by Defendants through fraud and deceit. On December 1, 2020, Defendant Elliot S. Smerling contacted SVB, holding himself out to be the founder of JES Global Capital III, L.P. (the "JES Fund") and Defendant JES Global Capital GP III, LLC (the "JES GP"), the JES Fund's general partner. Defendants represented to SVB that the JES Fund was a legitimate private equity fund, managed by Defendants, that had $500 million in capital commitments from prominent limited partners, including endowments for New York University and the University of Miami, and financial institutions such as Bank of New York Mellon, and that the JES Fund already had invested nearly $100 million in three portfolio companies. These representations were false. In reliance on these false representations by Defendants, however, along with forged and falsified documents provided by Defendants, SVB agreed to issue a $150 million line of credit, of which nearly $95 million was immediately drawn down.

2.    In particular, during the course of SVB's standard pre-lending diligence process, Defendants provided a document they represented to be the JES Fund's 2019 audited financial statements (the "Audited Financials"), which included two pages purporting to be an unqualified audit opinion signed by BDO USA, LLP, a prominent audit firm.  The audit opinion was a forgery. In fact, the JES Fund is not and has never been a BDO client, BDO did not issue any audit opinion with respect to the JES Fund and the "BDO USA, LLP" ink signature is not authentic.

3.    In addition to the Audited Financials, Defendants provided to SVB numerous other financial and business documents, all of which Defendants represented to be true and accurate. These documents include a roster naming approximately 20 limited partners who purportedly had committed $500 million in the aggregate to the JES Fund, subscription agreements signed by the limited partners, bank statements and other financial records.  Upon information and belief, all of these documents were inauthentic, did not provide accurate information or were forged.

4.    In reliance on these fraudulent documents and other representations made by Defendants, SVB entered into a Loan and Security Agreement (the "Loan Agreement") with the JES Fund and Defendant JES GP, effective February 3, 2021.  Under the Loan Agreement, SVB agreed to extend to the JES Fund a line of credit of up to $150 million, secured by the $500 million in capital commitments Defendants assured SVB had been made by the limited partners to the JES Fund.  That same day, SVB wired $94,957,322.65, which was drawn down by the JES Fund pursuant to the Loan Agreement, to Sumitomo Mitsui Bank Corporation ("SMBC") at the direction of the JES Fund, purportedly to close out the JES Fund's prior line of credit with SMBC.

5.    While conducting post-closing diligence, SVB requested additional information from Defendants, as permitted under the Loan Agreement.  Defendants refused to provide the requested information, including basic facts such as the name of the individual auditor at BDO

who provided the unqualified audit opinion concerning the Audited Financials and corporate governance documents for the JES Fund's purported investment portfolio companies.  Defendants did not provide this information because it did not exist.  The failure by Defendants to provide the requested information prompted further investigation by SVB, which in turn revealed the forged and falsified documents and information that Defendants had provided.

6.      On February 26, 2021, SVB sent Defendants a notice declaring an Event of Default under the Loan Agreement based on Defendants' provision of forged and falsified information, and demanding immediate repayment of the amounts drawn down under the Loan Agreement.  As of this filing, Defendants have not repaid the outstanding principal balance of $79,957,322.65, plus additional interest, charges, fees and other obligations owing under the Loan Agreement.

7.      On February 26, 2021, Smerling was arrested in Florida by agents with the Federal Bureau of Investigation ("FBI") and charged with violations of federal criminal law.  In particular, Smerling was charged with wire fraud and aggravated identify theft in connection with the SVB loan in a criminal complaint filed by the United States Attorney for the Southern District of New York.  According to the criminal complaint, Smerling falsified the audit opinion contained within the Audited Financials, as well as signatures and bank records purporting to reflect commitments on behalf of at least two limited partners.  Subsequent investigation by SVB established that most or all of the other purported limited partner investors were similarly falsified by Defendants.

8.      On March 3, 2021, following a detention hearing in the United States District Court for the Southern District of Florida, Smerling was determined to be a flight risk.  Based on findings by the magistrate judge, including that the evidence against Smerling on these matters was "very substantial," Smerling was remanded into custody without bond and, upon information and belief, has been or will shortly be moved to the Southern District of New York for prosecution.

9.      SVB brings this complaint to recover amounts that were fraudulently obtained by Defendants from SVB, and to obtain any and all other proper and just remedies.

## PARTIES AND VENUE

10.     Plaintiff Silicon Valley Bank is a California corporation with its principal place of business at 3003 Tasman Drive, Santa Clara, California.  SVB also has a substantial office in New York, with more than 150 employees, including employees who evaluated and approved the line of credit that was extended to the JES Fund under the Loan Agreement.

11.     Defendant JES Global Capital GP III, LLC is a Delaware limited liability corporation with its principal place of business at 4095 State Road 7, L-306, Wellington, Florida 33449.  Defendant JES GP is the general partner of JES Global Capital III, LP.

12.     Defendant Elliot S. Smerling is an individual who, upon information and belief, resides in Lake Worth, Florida.

13.     Third party JES Global Capital III, L.P. is a Delaware limited partnership with its principal place of business at 4095 State Road 7, L-306, Wellington, Florida 33449.

14.     The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332, because there is diversity of citizenship between the parties and the amount in controversy exceeds the sum of $75,000, exclusive of costs and interest.

15.     The Court has jurisdiction over Defendant JES GP based on its express consent in the Loan Agreement to jurisdiction and venue in the state and federal courts of New York.  The Court has jurisdiction over Defendant Smerling based on his conduct in connection with the negotiation and execution of the Loan Agreement, his retention of a New York based attorney to negotiate the Loan Agreement and related documentation, his use of funds obtained through the Loan Agreement to pay off debts owed in New York and other conduct alleged herein.

16.     Venue in this District is proper because (i) New York was designated as a proper venue under the Loan Agreement and (ii) under 28 U.S.C. § 1391(b), a substantial part of the events giving rise to the claims occurred in the Southern District of New York.

**SUBSTANTIVE ALLEGATIONS**

I.     **THE LOAN AND SECURITY AGREEMENT**

    A.     **Smerling's Approach to SVB and the Pre-Closing Diligence Process**

17.     On December 1, 2020, Smerling, unsolicited, called SVB's Head of Global Fund Banking to discuss establishing a line of credit with SVB.  Smerling represented that he, through Defendant JES GP, oversaw and managed the JES Fund.  Later that day, Smerling communicated via email to SVB that the JES Fund was a $500 million fund, with $50 million in capital that had already been received from its limited partners, and $450 million in additional capital committed by the limited partners.  Smerling also told SVB that the JES Fund had an existing line of credit with SMBC in New York, on which there was approximately $100 million drawn down, and that the JES Fund wished to close that line of credit and open a similar line of credit with SVB.

18.     In response, SVB informed Defendants that SVB would conduct diligence regarding Smerling's request for a line of credit for the JES Fund.  In connection with this diligence process, SVB requested audited financials for the JES Fund covering the prior year.  SVB also requested documentation to identify the limited partner investors in the JES Fund and substantiate the $500 million purported commitment by those investors to the JES Fund, which would constitute the collateral for the line of credit that the JES Fund sought to establish.

19.     SVB and Defendants also negotiated a nondisclosure agreement, which was effective as of December 3, 2020.  Defendants retained attorneys located in New York and affiliated with the law firm Akerman LLP, who negotiated the nondisclosure agreement on behalf of Defendants and assisted Defendants in obtaining the line of credit from SVB.

5

20.     On December 4, 2020, Defendants, through Smerling, provided SVB with numerous financial and corporate documents, including the Audited Financials.  The second and third pages of the Audited Financials are titled "Independent Auditor's Report," with a date of April 21, 2020, are on BDO letterhead and (as is typical) are signed with an ink signature that reads "BDO USA, LLP."  The audit opinion provided to SVB by Defendants states that the consolidated financial statements present fairly, in all material respects, the financial position of the JES Fund as of December 31, 2019.  The financial statements that follow this two-page audit opinion represent that the JES Fund had nearly $150 million in assets, including investments in three portfolio companies, and nearly $100 million in liabilities, including a loan from SMBC.

21.     Defendants also delivered to SVB, in response to SVB requests, documents that Defendants provided as evidence of the JES Fund's limited partner commitments.  These included a "JES GLOBAL CAPITAL III LP CAP TABLE," printed on "Orangefield-columbus" letterhead, and an exemplar capital call, directed to Sir Michael Kadoorie at the Peninsula Hotel on behalf of CLP Holdings, Ltd., also printed on "Orangefield-columbus" letterhead.

22.     The Orangefield Group is a financial services company that provides, among other services, fund administration services to private equity funds.

23.     The "Orangefield-columbus" documents identified as limited partners in the JES Fund, among other individuals and entities, the following: BBVA Compass Securities; BNY Mellon Corp.; CLP Holdings Ltd.; Huntsman Gay Partners; Meridian Capital, LLC; the NYU Endowment; Sun Trust Robinson Humphrey, Inc.; the University of Miami Endowment; Steven Berrard; and Steven Cohen.  These documents also indicated that the limited partners of the JES Fund had collectively made a total commitment of $500 million to the JES Fund, of which $450 million remained uncalled and available to the JES Fund.

24. SVB made subsequent inquiries of Defendants regarding certain limited partner commitments, including the full legal names of certain limited partners and the types of accounts being used to fund the commitments. Defendants provided documents and information in response to those inquiries. At no time did Defendants inform SVB that the limited partners under discussion in fact had never made any commitment to make any investment in the JES Fund and, in fact, had no relationship whatsoever either with the JES Fund or Defendants.

25. In the course of its diligence, SVB also requested bank statements evidencing the receipt of the JES Fund's initial $50 million capital call from the limited partners. In response, Defendants provided a document on SMBC letterhead titled "Bank Statements" that listed numerous wire transfers between December 9 and 11, 2019, totaling $50 million.

26. Defendants also provided to SVB a copy of the limited partnership agreement governing the JES Fund, as well as a copy of the subscription agreement pursuant to which the limited partners would make capital commitments to the JES Fund. After reviewing these materials, as part of its diligence process, SVB also obtained signed subscription agreements purportedly executed on behalf of each of the limited partners in the JES Fund.

27. The above documents were reviewed internally by several employees of SVB to determine whether SVB should extend a line of credit to the JES Fund. Among others, a senior credit manager of SVB, who works out of SVB's New York office, reviewed these materials.

28. Because the JES Fund was not an existing client of SVB, evidence of its financial standing was central to SVB's determination as to whether to extend a line of credit.

29. In addition, because the collateral for any line of credit would be the capital commitments made by the limited partners of the JES Fund, evidence substantiating the existence

of the limited partners and confirming their commitment to provide $500 million in capital to the JES Fund was central to SVB's determination as to whether to extend a line of credit.

30.     Without evidence of the JES Fund's financial standing and limited partner commitments, SVB would not have entered into the Loan Agreement with the JES Fund.

31.     In reliance upon the documents described in paragraphs 20 to 30, among other materials, SVB entered into a term sheet regarding a line of credit with the JES Fund and Defendant JES GP on December 18, 2020.  The term sheet was signed by Defendant Smerling.

32.     In reliance upon the documents described in paragraphs 20 to 30, among other materials, SVB entered into the Loan Agreement with the JES Fund and Defendant JES GP as of February 3, 2020.  (Ex. A, Sch. I, at 2.)  The Loan Agreement was signed on February 3, 2020 by Defendant Smerling on behalf of both the JES Fund and Defendant JES GP.  (Ex. A, at 31.)

### B.     The Loan Agreement

33.     Under the Loan Agreement, SVB agreed to extend to the JES Fund, as the borrower, a line of credit up to $150 million.  (Ex. A, Sch. I, at 1.)  In exchange, the JES Fund and Defendant JES GP granted SVB a continuing security interest in the limited partner capital commitments to the JES Fund, including the right to make capital calls.  (Ex. A, at ¶ 3.1, pg. 24 & Ex. A.)

34.     Among the conditions precedent in the Loan Agreement for an extension of credit by SVB are the delivery to SVB of bank statements evidencing the JES Fund's receipt of capital contributions from a recent capital call and the subscription agreements between the JES Fund and its limited partners, including signatures. (Ex. A, at ¶¶ 2.1(d) & (j).)  Also among the conditions precedent in the Loan Agreement for an extension of credit by SVB are that all representations and warranties in the Loan Agreement are true and accurate at the time.  (Ex. A, at ¶ 2.2(b).)

35.     In connection with the Loan Agreement, and as a condition precedent for the extension of any credit, the JES Fund and Defendant JES GP represented and warranted that:

    a.   the signature pages on each limited partner subscription agreement accurately described the limited partner's capital commitment to the JES Fund (Ex. A, at ¶ 4.2);

    b.   the financial statements provided by Defendants fairly present in all material respects the JES Fund's financial condition (Ex. A, at ¶ 4.5);

    c.   the fair value of the JES Fund's assets exceeds the fair value of the JES Fund's liabilities (Ex. A, at ¶ 4.6);

    d.   the partnership and subscription agreements between the JES Fund and the limited partners are in full force and effect and in substantially the same form as documentation delivered to SVB (Ex. A, at ¶ 4.12); and

    e.   Defendants made no written factual representation, warranty or other statement to SVB that contained any untrue statement of material fact or omitted any material fact.  (Ex. A, at ¶ 4.14.)

36.    Under the Loan Agreement, the JES Fund and Defendant JES GP undertook to provide audited financial statements for the JES Fund together with an unqualified audit opinion (Ex. A, at ¶ 5.3(c)), other information reasonably requested by SVB (Ex. A, at ¶ 5.3(n)) and further assurances as deemed necessary by SVB to protect its interest.  (Ex. A, at ¶ 5.8.)

37.    The Loan Agreement further provided that a breach by the JES Fund or Defendant JES GP of the obligation to provide audited financial statements and unqualified audit opinions, or other information reasonably requested, is a covenant default and thus an Event of Default under the Loan Agreement.  (Ex. A, at ¶ 7.2(a).)  The Loan Agreement further provided that if any writing provided to SVB is incorrect in any material respect when provided by the JES Fund, Defendant JES GP or any person acting for either entity, it is an Event of Default.  (Ex. A, at ¶ 7.10.)

38.    If an Event of Default has occurred and is continuing, the Loan Agreement provides that SVB may exercise certain enumerated rights and remedies, including suspension or termination of the line of credit and the right to declare all principal and interest extended or owed under the line of credit immediately due and payable.  (Ex. A, at ¶ 8.1.)

39.     The Loan Agreement is governed by New York law without regard to conflicts of law and provides that all parties consent to the exclusive jurisdiction of, and venue in, the state and federal courts in the Borough of Manhattan in New York City.  (Ex. A, at ¶ 10.)

40.     Following execution of the Loan Agreement, on February 3, 2021, pursuant to instructions from the JES Fund, SVB wired $94,957,322.65 to an account at SMBC in New York that SVB was told by Defendants was associated with the JES Fund.

## II.     POST-CLOSING DILIGENCE

### A.     Requests for Information from Defendants

41.     Following the February 3, 2021 closing of the Loan Agreement and SVB's wiring of $94,957,322.65 to the SMBC account in New York, SVB's post-closing due diligence team determined that additional information should be requested from Defendants.

42.     To that end, on February 17, 2021, SVB contacted a representative of the JES Fund to request contact information for representatives at BDO, which Defendants had previously represented was the auditor of the JES Fund, and the Orangefield Group, which Defendants had previously represented was the fund administrator for the JES Fund.  In response, Defendants told SVB that the JES Fund and Defendant JES GP were negotiating new agreements with BDO to act as both the JES Fund's auditor and its fund administrator, and that an engagement partner for the JES Fund and Defendant JES GP had not yet been assigned by BDO.

43.     Two days later, on February 19, 2021, Smerling wrote to SVB to demand an explanation for why SVB was requesting information post-closing.  In particular, Smerling stated that he was "extremely concerned regarding the manner in which we are being treated" and was "flummoxed" by SVB's inquiries.  Smerling demanded that SVB share any questions for BDO or the JES Fund's attorneys in writing prior to any further inquiries.

44.     Following Smerling's February 19 response, SVB requested that Defendants attend a video conference on Monday, February 22, 2021 to address SVB's requests for information.  In advance of that meeting, SVB requested that Defendants provide the following information:  (i) diligence materials and basic corporate documents for the JES Fund's three portfolio companies; (ii) additional supporting documentation regarding the JES Fund's limited partners, including contact information; and (iii) the name of the partner at BDO responsible for the Audited Financials that were provided by Defendants to SVB during the original diligence process.

45.     Neither Smerling nor any employee of the JES Fund or Defendant JES GP attended the February 22, 2021 videoconference.  Instead, two attorneys with Akerman LLP, including an attorney who is identified on the firm's website as working in the firm's New York office, attended the videoconference.  The information SVB had requested was not provided during the call.

### B.     Discussions with BDO

46.     Concurrent with SVB's inquiries of Defendants, SVB also directly communicated with representatives of the legal department at BDO to inquire about the audit opinion that Defendants had provided as part of the Audited Financials to SVB during diligence.

47.     A representative of BDO's legal department informed SVB that BDO did not have any record of the JES Fund being a client of BDO.

48.     Based on the information available from BDO, the Audited Financials provided by Defendants to SVB are not authentic, and Defendants' use of BDO letterhead was unauthorized.

## III.    SUBSEQUENT NEGOTIATIONS, DEFAULT & NONPAYMENT

49.     Following the February 22, 2021 videoconference, Defendants, through Akerman LLP, offered to amend the Loan Agreement with SVB to require the JES Fund to pay $15 million of the outstanding balance to SVB within seven days, and the remaining balance  by May 1, 2021. On February 25, 2021, the parties to the Loan Agreement executed an amendment requiring that

the JES Fund pay $15 million to SVB no later 12:00pm PST that day, with the remaining balance due by April 30, 2021.  On February 25, 2021, SVB received $15 million from a JES Fund account at Pacific Western Bank, in partial satisfaction of the outstanding balance.

50.     On February 26, 2021, SVB delivered a notice of an Event of Default to the JES Fund and Defendants based upon the inauthentic or forged documents delivered by Defendants to SVB (Ex. B), including the Audited Financials and limited partner documentation.  As permitted under the Loan Agreement, the notice declared that the outstanding balance, interest, charges, fees and other obligations owing under the Loan Agreement were immediately due and payable.

51.     As of this filing, Defendants have not repaid the outstanding balance under the Loan Agreement, which amounts to $79,957,322.65, plus additional interest, charges, fees and other obligations owing under the Loan Agreement.  Also as of this filing, Defendants have not provided the additional information requested by SVB.

## IV.     RELATED CRIMINAL PROCEEDINGS

52.     On February 26, 2021, Smerling was arrested by FBI agents in Florida and charged with federal crimes as set forth in a criminal complaint filed by the United States Attorney for the Southern District of New York.  The complaint charges Smerling with wire fraud under 18 U.S.C. §§ 2 & 1343, and aggravated identity theft under 18 U.S.C. §§ 2, 1028A(a)(1) & 1028A(b).

53.     According to the criminal complaint, BDO told the FBI that: the audit opinion contained in the Audited Financials was not prepared by BDO; the letterhead uses an address at which BDO has not operated for several years; the language and style of the opinion are not consistent with the language and style of current BDO opinions; and to date, BDO has found no indication that Smerling, the JES Fund or Defendant JES GP are or were ever clients of BDO.

54.     According to the criminal complaint, the chief investment officer of an endowment fund in New York (believed to be the NYU Endowment Fund, which is a limited partner identified

on documents provided by Defendants to SVB) told the FBI that: the officer has no knowledge of Smerling, the JES Fund or Defendant JES GP; the signature appearing on the signed subscription agreement naming the fund is not the officer's signature; and to date, the endowment fund has found no indication that it wired any money or made any commitment to the JES Fund.

55.     According to the criminal complaint, representatives of an investment manager based in New York that is a limited partner identified on documents provided by Defendants to SVB told the FBI that: the signature of the chief executive officer of the investment manager appearing on the signed subscription agreement naming the investment manager is highly unlikely to be legitimate; and to date, the investment manager has found no indication that the investment manager wired any money or made any commitment to the JES Fund.

56.     On March 3, 2021, a detention hearing for Smerling was held before the United States District Court for the Southern District of Florida.  At that hearing, Smerling consented to transfer to the Southern District of New York for trial.  Also at that hearing, attorneys with the U.S. Department of Justice argued that Smerling is a flight risk based on his substantial wealth, prior international travel, marriage to a Brazilian citizen, maintenance of a home in Brazil and the nearly $80 million owed to SVB that remains unaccounted for.  At the conclusion of the hearing, Magistrate Judge William Matthewman remanded Smerling into custody without bond.

57.     On March 4, 2021, Judge Matthewman issued a Pretrial Detention Order (Ex. C) in which he found a serious risk of flight or nonappearance if Smerling is released from federal custody, and that no condition or combination of conditions would reasonably assure Smerling's appearance.  (Ex. C, at 1.)  Judge Matthewman further wrote that the "weight of the evidence against Defendant is very substantial," and that Smerling's conduct "involves a large-scale

financial fraud" in which he "impersonat[ed] various offices of a university endowment fund and an investment fund and forg[ed] several documents."  (Ex. C, at 2–3.)

58.     Based on the foregoing, and upon information and belief:

a.   the BDO audit opinion appearing within the Audited Financials delivered by Defendants to SVB is a forgery;

b.   the limited partner roster and examplar capital call letter, printed on "Orangefield-columbus" letterhead and provided by Defendants to SVB, are not authentic documents;

c.   the executed subscription agreements provided by Defendants are not authentic documents;

d.   the JES Fund did not receive $50 million in capital from the purported limited partners, and the bank statements printed on SMBC letterhead purporting to show receipt are not authentic documents; and

e.   the JES Fund has not made investments in the three portfolio companies identified in the Audited Financials that were provided by Defendants to SVB.

59.     In sum, documents and information provided by Defendants to SVB in connection with the loan application and the Loan Agreement were fraudulent.

## CLAIMS

### COUNT I: BREACH OF CONTRACT
### (JES GP)

60.     Plaintiff repeats and realleges each allegation in paragraphs 1 through 59 set forth above, as though fully set forth herein.

61.     Defendant JES GP provided information and documents to SVB that were false in material respects in an effort to induce SVB to enter into the Loan Agreement.  Upon learning of Defendants' misrepresentations, SVB appropriately (i) declared an Event of Default under paragraph 7.10 of the Loan Agreement, (ii) terminated the line of credit extended to the JES Fund

under paragraph 8.1 of the Loan Agreement and (iii) demanded immediate repayment of all amounts due thereunder under the same.

62. The ongoing failure of Defendant JES GP to pay, or cause the JES Fund to pay, to SVB all amounts owed following the declaration of an event of default, including the outstanding principal balance of $79,957,322.65, constitutes a material breach of the Loan Agreement.

## COUNT II: FRAUDULENT INDUCEMENT
### (All Defendants)

63. Plaintiff repeats and realleges each allegation in paragraphs 1 through 59 set forth above, as though fully set forth herein.

64. Defendants, intending to induce SVB to enter into the Loan Agreement and extend a $150 million line of credit to the JES Fund, knowingly made false representations and statements to Defendants, and knowingly provided inauthentic and forged documentation.

65. In entering into the Loan Agreement, SVB relied upon the representations and statements made by Defendants, including statements that the JES Fund was a legitimate private equity fund, that the audit opinion issued in connection with the Audited Financials was genuine and that the JES Fund had $500 million in capital commitments from limited partners. SVB also relied upon documents and information provided by Defendants to SVB, including the Audited Financials, the identification of purported limited partner investors in the JES Fund, the signed subscription agreements, the exemplar capital call letter and financial data on the portfolio companies of the JES Fund. SVB would not have entered into the Loan Agreement had SVB known that the above information was false and the above documentation was not authentic.

66. SVB was damaged by Defendants' false statements and delivery of inauthentic documents, including but not limited to damages associated with SVB's wiring of $94,957,322.65 to a SMBC account in New York, of which $79,957,322.65 has never been repaid to SVB.

## COUNT III: CONVERSION
### (All Defendants)

67.     Plaintiff repeats and realleges each allegation in paragraph 1 through 59 set forth above, as though fully set forth herein.

68.     Defendants, intending to induce SVB to open a line of credit and pay approximately $95 million that was in the rightful possession of SVB, knowingly made false representations and statements to SVB, and knowingly provided inauthentic and forged documentation to SVB.

69.     As a result of Defendants' false statements and delivery of inauthentic documents, SVB was deprived by Defendants of SVB's rightful possession of $94,957,322.65, of which $79,957,322.65 remains in the possession, custody or control of Defendants.

## COUNT IV: UNJUST ENRICHMENT
### (All Defendants)

70.     Plaintiff repeats and realleges each allegation in paragraphs 1 through 59 set forth above, as though fully set forth herein.

71.     Defendants were enriched by SVB's wiring of $94,957,322.65, either because Defendants benefitted from the elimination of obligations to SMBC, a third party, or because Defendants obtained possession of $94,957,322.65.   Following the $15 million payment, Defendants remain enriched by $79,957,322.65 at the expense of SVB.

72.     Defendants' enrichment resulted from Defendants knowingly making false representations and statements to SVB, and Defendants knowingly delivering inauthentic and forged documentation to SVB.  It is contrary to equity and good conscience for Defendants to retain the $79,957,322.65 that was obtained from SVB through fraud, deceit and forgery.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff seeks an order:

a) declaring and finding that Defendant JES GP breached the terms of the Loan Agreement, including Sections 7.10 and 8.1;

b) awarding Plaintiff all available damages, including disgorgement and interest, for Defendants' breaches of contract and tortious conduct;

c) awarding Plaintiff the costs, expenses and disbursements of this action, including attorneys' and experts' fees; and

d) awarding Plaintiff such other and further relief as this Court may deem just, equitable and proper.

## JURY TRIAL DEMAND

Plaintiff hereby demands a jury trial.

Dated: March 24, 2021

By:  */s/ Lorin L. Reisner*
Lorin L. Reisner
Allan J. Arffa
Susanna M. Buergel
Christopher L. Filburn
Kristina Bunting
PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019-6064
Tel:  (212) 373-3000
Email: lreisner@paulweiss.com

*Attorneys for Silicon Valley Bank*