United States District Court

Southern District of New York

United States of America,

Plaintiff,

v.                                          Case No.: 2 CR 317 (DLC)

Elliot Smerling,

Defendant;

_____

Elliot Smerling,

Movant,

V.                                          Case No.: 21 CIV 3988 (DLC)

United States of America,

Respondent

---

**Movant's Reply to Government's Memorandum in Opposition**

**To Movant's Motion to Vacate or Set Aside His Sentence**

**Pursuant to 28 U.S.C. § 2255**

---

Pro se Movant, Elliot Smerling, respectively files his reply to the Government's ("Respondent") response memorandum in opposition, [cr-DE91], to his motion to vacate or set aside his sentence pursuant to 28 U.S.C. §2255. [Cr-DE 60 and Cv-DE 1}.

### Preliminary Statement

Movant presented seven grounds with which he exposed his team of attorneys' ineffective assistance and how their errors resulted in this court sentencing Movant to a longer-than necessary sentence of 97 months but, also, how he was prejudiced during pre-trial, in plea negotiations, at sentencing, and the estoppel effect those errors caused to his rights moving forward.

The response, however, grounds an opposition alleging "[Movant's] claims find no support in the law or in the record", [Cr-DE 65:3 and Cv-DE 9]. But contrary to Respondent's contention, "any amount of jail time has sixth amendment significance". **Strickland v. Washington,** 466 U.S. 668 (1984); Movant's 97- month sentence is 25 months more than U.S. Probation's recommendation, however, even that recommendation was a high number caused by counsels' error; Movant's should have had a recommendation of no more than 59 months.

The response further overlooks how counsel's error caused an estoppel effect to Movant's rights moving forward; Movant established the but for causation with all his grounds.

Next, the response obfuscates how Movant's counsels' affidavits fail to substantially justify their ineffective assistance; those affidavits are a reminder of an excerpt from the famous Abbott and Costello routine questioning "... who's on first, what's on second, ...I don't know who is on third" placing Movant's counsels in a quandary. Movants counsels billed almost $1,000,000 (one million dollars) for a whole lot of nothing.  See **United States v. Smerling,** case no. 21 Cr 317 (DCL) (S.D.N.Y.2021) (in the 12 months that the case had been in existence, a mere 56 docket entries show a whole of nothing took place; no formal objections filed and no pre-sentencing memorandum was filed); But See **United States v. Armenta,** case no. 2017-CR-00556-480723 (S.D.N.Y. 2017) (the robust docket with 100 entries evidences defense counsel's zealous representation).

Movant's criminal docket speaks for itself and, in many ways, his counsels' affidavits tossing back and forth responsibility suffices to show – by a preponderance of the evidence—that the assistance Movant received from his counsel during pre-trial, plea, and the sentencing stages of his criminal trial was ineffective.

Therefore, Respondent's contention that "[Movant]" claims find no support in the law or in the record", [Cr-DE 65:3 and CV-DE 9], is meritless. In fact, it is quite the opposite. As a matter of law, Movant's right to effective assistance of counsel was violated and that violation is factually supported by not only a merger docket but now, also, with his counsels' comical affidavits.

Simply put, Movant paid out almost $900,000 (nine hundred thousand dollars) of the $1,000,000 in legal fees billed for false and incomplete on-the-record information; to expand the scope of his criminal conduct from 2013 to 2019; to make him look non-credible; to expose him to harsher-than-necessary incarceration from exposure to COVID-19; to a longer-than-necessary sentence; and to foreclose his rights moving forward.

While counsel was causing prejudicial effects in Movant's case, Movant was in compliance with a settlement agreement with Silicon Valley Bank with which he paid $15,000,000 (fifteen million dollars), a fact counsels failed to bring to light to this court. The prejudicial effects caused by Movant's counsel, alone or cumulatively, can only be reversed under assistance of counsel and, thus warrants this Honorable Court **Granting** this motion to vacate the sentence pursuant to 28 U.S.C. § 2255.


## OFFENSE HISTORY

Respondent's offense history depiction goes to the heart of ground three in Movant's §2255 motion. But for counsels' errors, Respondent could not paint Movant as "[a] defendant [who] engaged in years-long scheme to defraud banks", [Cr-DE 65:2 and CV-DE 9:]. However, counsels' errors ongoing prejudicial effect extend to Respondent having the benefit of expanding the scope of Movant's criminal conduct to include not only more history of criminal conduct but also

"investors", even though no investors were caused harm; the superseding indictment by information expanded the scope of Movant's criminal conduct beyond 2013 to 2019 and from SVB and Citizens to include "investors". This permitted Respondent to paint Movant as a career long fraudster.

## PROCEDURAL HISTORY

1. **Arrest, Charges, and Pretrial Detention Proceedings**

   Movant concedes to the history, charges, and pretrial detention proceedings presented in the response. However, it must be noted that his counsel displayed ineffective assistance of counsel by failing to seek his pretrial release from the S.D.N.Y.; they failed to continue to examine securing pre-trial release. The pretrial detention proceedings go to the heart of ground 5 in Movant's §2255.

2. **The Defendant's Attempted Cooperation**

   Movant objects to Respondent's allegation that "Smerling's information did not rise to the level of substantial assistance". [Cr-De 65:7 and CV-DE 9:]. This goes to the heart of ground one in Movant's §2255 in that for Counsels' ignorance of SEC laws, lack of preparation, failure to investigate Movant's original information that cooperation would have risen to a level of substantial assistance; SVB's collapse and Citizen's fiscal distress speak for itself.

3. **The Plea Agreement.**

   Movant concedes with the procedural history of the plea agreement. However, his criminal conduct was out-of-character aberrant behavior to which he immediately pled guilty. But this plea agreement goes to the heart of ground three in Movant's §2255; but for counsels' errors the Movant would have avoided expanding the scope of his criminal conduct beyond 2019 when agreeing to accepting a superseding indictment by information. And but for counsels' error, the information would have been proffered under protection.

4. **The Guilty Plea.**
   Movant concedes with the procedural history of the guilty plea. However, the affirmations he made during that guilty plea were made under the influence of counsels' wrong advice-ineffective counsel. Movant made these affirmations from counsels' recommendations who have now admitted – by affidavit—their failure to understand finance and securities laws; this guilty plea goes to the heart of ground one in Movant's §2255. It was made unknowing and was unwillingly induced by providing the wrong advice.

5. **Sentencing.**
   Movant concedes to the procedural history of his sentencing. However, Movant's counsels' 13- page sentencing submission is on-the-record evidence of Movant's counsels' ineffective assistance at sentencing. That sentencing submission goes to the heart of grounds two, four, five and six in Movant's §2255. But, as must be noted, how movant's counsel never showed Movant that 13- page sentencing submission prior to the motion being filed.

6. **Smerling's Motion.**
   Movant concedes to its procedural history of the action.

7. **Affidavits from Counsel.**
   Movant concedes to the procedural history of the affidavits from counsel.

## APPLICABLE LAW

Movant concedes to the applicable law to be applied to his §2255 motion.

## Legal Argument

### Ground One.Counsel's Decision Against Filing a Whistleblower Action Or Objecting to SVB's Impact Statement is Ineffective Assistance

Respondent's opposition to ground one of Movant's §2255 motion miscomprehended the crux of the claim. They buttress an opposition on his counsel's failure to file a whistleblower action, excuse his failure to object to SVB's victim impact letter, and allege counsels' actions caused no

prejudice. But their attempt to deem Movant's ground one as meritless is unsubstantiated because that opposition ignored the crux of ground one which is;

### A. Movant's Attorneys Rendered Ineffective Assistance in their Failure to Understand Finance and SEC Laws.

The case-in-chief involved finance and securities violations. But Movant's counsels do not have any experts in the subject-matter of finance and SEC. For example:

David "Kubiliun" admits to having "no experience in whistleblower litigation", [Cr-DE 65-1:2 and CV-DE 9:], but that response ignored altogether the legal team's lack of expertise in the finance and SEC laws and how that lack thereof resulted in ineffective counsel.

Adriana "Collado-Hudak", states ...that whistleblower claims were outside the team's expertise", [CR-DE 65-3:2 and CV-DE 9:], but that response ignores altogether, Movant's claim of his counsel's lack of knowledge of finance and SEC laws, and how the team's lack of expertise amounts to ineffective assistance; and finally,

Philip L. "Reizenstein's" affidavit ignores altogether the claim of whether or not he understood finance and SEC laws. Instead, he bails out by stating "[he] was not hired as Mr. Smerling's criminal defense counsel ...", [CR De 65-4:5 and CV-DE 9:]; he states this, notwithstanding, his involvement in all stages of Movant's criminal proceedings.

Movant's ground one, as its core, is not whether the counsels' deviated from best practices or most common custom, but "whether representation amounted to incompetence under prevailing professional norms". See **Harrington v. United States,** 689 F. 3d at 129-30 (2nd Cir 2012) (quoting **Harrington v. United States,** 562 U.S. 86, 105 (2011).

The first sentence of Movant's ground one in his §2255 motion claimed, inter alia, that "[his] attorneys rendered ineffective counsel in their failure to understand securities laws, they lacked preparation...", [CR-DE__ and CV-DE1]. Movant's legal teams lack of knowledge of finance and SEC laws coupled with their lack of

preparation satisfies prong one of the **Strickland**; their silence or admitted incompetence in finance and SEC laws demonstrates his attorneys' performance fell below an objective standard of reasonableness under "prevailing professional norms". **Strickland** 466 U.S. 688. No reasonable attorney would have accepted the engagement in a case where they lacked subject-matter-competency. No reasonable attorney would have failed to prepare.

Moreover, neither Respondent's response nor Counsels' affidavits address the competency claim brought forth on the first sentence in ground one of Movant's §2255. Instead, they solely excuse the failure in filing a whistleblower complaint. But even if believed that the core of ground one was the failure in filing a whistleblower complaint, then Movant's counsel's affidavits evidence their lack of knowledge in the subject-matter.

What a whistleblower would accomplish that  for his cooperation, the Movant must receive at most a minimal sentence. This is the crux of the case. The Movant had direct knowledge of the wrongdoings of various parties to his and other transactions which would assist the Government in other prosecutions.

The False Claim Act is one of the Government's most effective weapons against fraud. By the bold step to become a whistleblower, you can expose fraud and assist the Government in recovering stolen funds on behalf of the taxpayers.

In fact, you could actually earn compensation for doing it. However, the main purpose here was to avoid the consequences of what occurred by not doing it. Instead of assisting, the Movant became the main culprit in a fraud when in fact he was actually a third- party person in the transaction.

Yes, there is some exposure and this action would have an effect on the Movant future is the securities business, but a risk/reward analysis would dictate that it was the right move.

Instead, counsels avoid the issue and just say we are not schooled in this area of law. If such is the case, then they should suggest to their client they need acquire other counsel to do so. All attorneys have a duty to understand the intricacies of a case and if they do not, the option is to get co-counsel or not take on the case.

To just dismiss this action because of lack of knowledge is ineffective counsel on its face and if such was the case, the counsels involved in this case should not have taken on the legal responsibility of it.

But, more egregious, is their lack of preparation and failure to investigate Movant's request. Furthermore, those affidavits evidence the presence of an attorney-client conflict stemming from Movant's counsels' ignoring Movant's multiple requests for them to review, prepare, and investigate the subject-matter of this case and Movant's original information with which to "secure whistleblower status, [to] avoid prosecution, defer prosecution, secure a better plea deal, or achieve a lower sentence". [CR-DE-_ and CV-DE 1].

Counsels' ignoring Movant's multiple requests took place even though they billed almost $1,000,000 (one million dollars) and collected approximately $900,000 (nine hundred thousand dollars).

The crux of ground one is Movant's counsels' lacking subject-matter expertise cements their inability to render effective assistance. That is circumstance both Respondent and Movant's counsel's failed to address in their response. That lack of subject-matter expertise is sufficient in establishing a sixth amendment violation of ineffective assistance of counsel which warrants Granting Movant's motion.

### B. Movant's Attorneys Rendered Ineffective Assistance of Counsel in their Failure to Object to SVB's Victim Impact Letter.

By their own admissions, Movant's Attorneys evidence their ineffective assistance when failing to object to SVB's victim impact letter. Nonetheless, Respondent's response opposes by justifying the ineffective assistance under the color of "sound Strategy". [CR-DE 65-1:3 and DV-DE 9]. That opposition does this even though:

Kubilium alleged giving Movant "the option to move the Court for a continuance", [CV-DE 65-1:3 and CV-DE_].by interference indicates Kubilium believed an objection was appropriate; then Lewis's silence with failure to object to the SVB victim impact letter and its damning allegations, [CE-DE 65-3:3 and CV-DE__], he states this, even though the substance of the letter infected Movant's PSR and whether an objection was relevant under Fed. R. Crim P.32 and finally,

Reizenstein, who alleges not being hired for criminal defense, puts his two cents into the ineffective assistance by alleging "certainly, defense counsel can respond to a victim's letter, and I worked with [Movant's defense counsel to formulate a presentation to this court", [CR-DE 65-4:5-6 and CV-DE_]. However, that alleged presentation was not a formal objection. In fact, the presentation did nothing more than obfuscate SVB and Citizen's unclean hands.

Once again, Movant's attorneys place themselves in a quandary playing that Abbott and Costello routine questioning "...who's on first, what is on second...", I don't know who is on third. Thus, by their own admissions they demonstrate their failure to object to that victim impact letter. They could not—as a team—come to a decision on whether to file an objection could have been lodged and much less why it should have been lodged.

There is a dispute as to when it was received, however, it was before the sentencing hearing and its importance to the case and how the Movant is viewed by the judge is dramatically affected. At minimum, the trial counsels should have requested an extension so to be prepared for its negative effects rather than just state that the victims have a right to do it.

There is no question, the unclean hands document applies. The unclean hands doctrine applies to cases where a party, such as SVB and Citizens Bank N.A. and at least eight other banks, see **Exhibit A** for a listing of the banks, has acted unethically in connection to the circumstances that have led to the suit. The intent of the Act is to keep a person from abusing the justice system in order to benefit from a situation they created when they acted in bad faith.

The Financial Institutions listed have marketed and provided capital call lines of credit ("CCL") to whomever they are soliciting the CCLs to, are breaking the law by issuing CDL loans in excess of the limited 15% of the private fund's aggregate capital contributions and uncalled committed capital. Furthermore, the listed Financial Institutions have and continue to permit such borrowing, indebtedness, §80a-6; but see **United States v. Smerling,** 1:21-CR-00317-DLC at Docket Entry No. 46 (S.D.N.Y. 2021) (where Silicon Valley Bank admits extending a capital call line of credit up to $150 million secured by $500 million in capital commitments

and thus, breaking the 15% limitation; Silicon Valley Bank provided this loan for 364 days which also exceeds the 120- day limit).

Leverage in excess of 15% and allotting capital for a term exceeding 120 day violates numerous SEC regulations; however, that conduct affects the integrity of the capital markets while exposing investors to harm. This is an industry wide problem which requires immediate intervention from the SEC.

In fact, Fed. Crim. R. 32 says otherwise, that an objection should have been filed – at-least to preserve the record for future review. The legal team has cemented in their own words their lack of preparation and understanding of the law.

But assuming that Respondent's "sound strategy" excuse had a leg to stand on, no reasonable attorney would allow the big bad wolf to play the victim with false or incomplete script which would lead to a client's serving a longer-than-necessary sentence or pay a higher-than-necessary-restitutions—forfeiture. Thus, an objection was necessary to disclose to this court SVB and Citizens unclean hands and to preserve the record for future review. The unclean hands doctrine is relevant here, it carries out the equitable maxim that no one shall profit by his own wrong or come into Court with restitution, interest, and forfeiture from their own criminal conduct.

The unclean hands occurred when both banks violated Federal Law and did so by their own admissions when they drafted loan agreements to the Movant.

Movant's legal team were ineffective in not exposing this fact but, more egregious, failed their duty as officers of the Court. Instead, the legal team obfuscated the information and permitted SVB's damning letter to infect Movant's PSR and the substantive content which led to a longer-than-necessary sentence and a higher than-necessary restitution and forfeiture; under the unclean hand doctrine, SVB and Citizens would not be entitled to that restitution amount or the forfeiture; much less the interest claimed. But assuming that it could be said the strategy was sound, there is no excuse from the legal team failure to object to false or incomplete information, which, by extension, would be withheld from this court; an objective was required, they failed.

Therefore, Respondent's objection is grounded on how Movant's counsels' "Strategy was sound" and Movant's claim not finding support is a far cry from the

truth. No reasonable attorney would have failed to object to false or incomplete information that could substantiate a longer-than-necessary sentence or a higher-than-necessary restitution and forfeiture; that failure to object brings to light facts to the Court which warrant this Court's to grant Movant relief.

## Ground 2. Counsels lack of Objection to the SBV's Impact Letter is

### Ineffective Assistance of Counsel

The Government considers the Movant's argument in Ground 2 meritless regarding his argument against the additional two- point enhancement **relating to financial harm done to a financial institution due to it creating a duplicate enhancement for the same act.**

> The Government's argument rests entirely on the Second Circuit Case, **United States v. Kilkenny,** 493 F. 3d 122, 131 (2d. Cir 2007) ("We have previously ruled that the cumulation of the dollar amount enhancement and the financial institution enhancement do not constitute double-counting because the two enhancements serve different purposes.").

> Case law aside, this ruling goes directly against the Fifth Amendment of the United States Constitution which states:
> "No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury, except in cases arising in the land or naval forces, or in the militia, when in actual service in time of war or public danger; nor shall any person be subject for the same offense to be twice put in jeopardy by life or limb; nor shall be compelled in any criminal case to be witness against himself; nor shall he be deprived life, liberty, or property, without the due process of law; nor shall private property be taken for public use, without just compensation."

The Double Jeopardy Clause protects against imposition of multiple punishment for the same offense. Ex-parte Language, **85 U.S. (18 Wall) (1874); North Carolina v. Pearce,** 395 U.S. 711, 717 (1969).

However, when the sentencing commission chose to embrace a real-offense regime, a problem arose since the new Guidelines base punishment on a defendant's actual conduct as opposed to the offense of conviction. The Guidelines sweep a variety of factors into the sentencing inquiry, including criminal offenses for which no conviction has been obtained.

Under the Guidelines, therefore, prosecutorial charging decisions and the verdicts of acquittal after jury trial may have little impact at sentencing. Long before the adoption of the Guidelines, courts bent on rationalizing the real-offense regime devised a convenient yet dangerous fiction in the form of the "punishment-enhancement" distinction. According to this theory, a sentence enhancement does not constitute punishment.

Thus, challenges to the use of non-conviction sentences to increase sentence length are easily answered; the sentence for the offense of conviction is merely enhanced on the basis of the extraneous criminal conduct.

This distinction is particularly convenient in the double jeopardy setting. According to the Supreme Court's "favorite saying, George C. Thomas, **An Elegant Theory of Double Jeopardy,** 1988 U. ILL. L. Rev. 827,830., double jeopardy "protects against a second prosecution for the same offense after acquittal, against a second prosecution for the same offense after conviction, and against multiple punishments for the same offense." **North Carolina v. Pearce,** 395 U.S. 711,717. The Double Jeopardy Clause states in relevant part: "nor shall any person subject for the same offense to be twice put in jeopardy of life or limb." U.S. CONST. amend V.

Because a defendant is "enhanced" for an unadjudicated crime is neither "punished" nor tried for that offense, the Double Jeopardy Clause in not technically implicated.

However, in **United States v. Mccormick,** the Second Circuit joined the Tenth Circuit, **United States v. Koonce,** 945 F. 2d. 1145 (10th Cir. 1991), in holding that the Guidelines use of unadjudicated crimes to increase sentence length constitutes punishment and that subsequent attempts to formally prosecute those offenses are barred by the Double Jeopardy Clause. Interestingly, both courts found the punishment question reasonably straightforward, even though the punishment-enhancement fiction forms one of the central premises of twentieth-century sentencing jurisprudence.

In the end, **McCormick,** was correct in recognizing enhancement as punishment, but failed to embrace the appropriate constitutional remedy. Instead of preventing the subsequent of the offense at issue, the court should have prohibited the original sentence enhancement. The real-offense system should be abandoned on constitutional and practical grounds. It encourages the Government to circumvent the affirmative commands of the Fifth and Sixth Amendment.

In addition, it has spawned enormous administrative difficulties and has not produced the expected benefits. Sentencing remains fraught with inequities. Eliminating the real-offense character of the Guidelines would avoid many of these inequities and bring us closer to our goals of justice is sentencing.

The fact is in instant case, the Probation Officer did try to do this than fighting this injustice, by instead proposing a downward variance to 72 months and 24 months supervised release. This would have offset the negative effect of the other the doubling up on the enhancement.

Additionally, this situation parallels another case in the Second Circuit, **U.S. v. Lauersen,** 348 F. 3d 329 (2d Cir. 2003). In the end, The District Court's view of section 2F1.1(b)(8)(B) runs directly counter to the Commission's view as expressed in Application Note 19 to section 2F1.1. That note specifically lists "insurance company" among the types of institutions

included within the guideline's definition of "financial institution" for purposes of subsection 2F1.1(b)(7)(B) (Nov 1, 1998). The Seventh Circuit reasoned as follows. The commentary to section 2F1.1 states that subsection 2F1.1 (b)(7)(B), which is renumbered as subsection 2F1.1 (b)(8)(B) in the Nov 1, 2000 Guidelines Manual, implements Congress's instruction to the Commission in section 2507 of Public Law 101-647; that section requires increased punishment for those who derive more than $1 million.

However, the Court realized that this enhancement presented a circumstance not recognized by the Sentencing Commission and as such permits a sentencing judge to make a downward departure. Cf. **United States v. Gigante,** 94 F,3d 53m 56 (2d Cir. 1996) (downward departure authorized where substantially enhanced sentence range results from a series of enhancements proven only by a preponderance of evidence), amending 39 F. 2d 42, 48 (2d Cir 1994).

This resulted in the instant case when the Probation Officer raised this argument. Unfortunately, counsels were again asleep at the switch and in the end the judge denied even though case law and legal rationale indicate it should have been granted.

Unfortunately, as shown above, the trial counsels again dropped the ball and rather than advocate for their client, they instead took the low road and agreed with the Government in allowing this enhancement, which as noted above, there were legal arguments to combat it. That is ineffective counsel and they breached their duty to their client by not advocating for him.

## **Ground 3. Smerling's Decision to Proffer was not the Appropriate Strategy**

An attorney, particularly a criminal attorney, their primary goal is to protect their client to ensure that he receives the best possible result, and in the case of a criminal defendant, the lowest sentence possible.

The trial counsels failed miserably in this aspect when they allowed their client to proffer and receive nothing in return. Normally, when providing information to the Government, a defendant, especially in today's criminal justice system has an expectation of receiving something in return, a sort of quid-pro-quo.

This can only be done if you properly protect you client. This can only be done by trial counsel meeting with the Government prior to a proffer being done and not after.

Proffer or "queen for a day" letters are written agreements between federal prosecutors and individuals under criminal investigation which permit these individuals to tell the Government about their knowledge of crimes, with the supposed assurance that their words will not be used against them in future proceedings.

Most proffers are made with the informal understanding that the Government, if satisfied that you are telling the truth in the proffer session, will subsequently enter into a formal, written immunity agreement or plea bargain.

The fact is your attorney and the prosecution should have already informally worked out, before you ever sit down for the proffer session, a basic understanding of (1) what you are likely to proffer; (2) what the contemplated post-offer immunity or plea agreement will you likely look like.

The problem here is that Movant's trial counsels did not protect him. The proffer has pros and cons. The information given can lead to other

investigations and result in another indictment being filed against you. Even if the prosecutor is not able to develop new information from your proffer; he will gain a tactical advantage from seeing how you fare in tough questioning, how you present yourself as a witness, and your theory of the case.

Proffering also has even bigger risks. Most proffering agreements allow the Government to use your statements against you for impeachment purposes if you take the stand in a subsequent proceeding and testify inconsistently with your proffer.

The fact in the instant case is that the Movant went into the proffer unprotected and the result was a superseding indictment. The Movant received a two-count Superseding Information which he pleaded guilty to which was a direct result of the proffer.

The Government tries to counter that saying the information enabled him to avoid trial on a three-count indictment that included an aggravated identity theft charge, which carries the prospect of a mandatory, two-year consecutive sentence.

That is no more than speculation. For had the proffer not occurred that other indictment would not have come into play as such the trade off from the superseding indictment would not existed.

Then the Government speculates in regard to the other concrete benefits that flowed from the defense strategy proffering with the Government in service of attempted cooperation, including a below-guideline recommendation from the probation office, the Government's recommendation of a sentence at the low end of the Guideline range as well as Movant's ultimate receipt of a sentence at the bottom of the Guideline Range.

That all sounds good, but in reality, the Movant did not get the below Guideline range recommendation from probation and receiving the low end is normal for a first- time offender.

So, in the end, the Movant received a Superseding indictment due to his trial counsels' recommendation to proffer. Again, any more sentence time from the actions of his trial counsels sets up the prejudice prong and therefore on its face is ineffective counsel, which occurred in the instant case.

### Ground 4 Counsel's Decision not to Audit is Ineffective Assistance

Obtaining an expert in a criminal white- collar case can be invaluable depending on the case. In the instant case, the need was to substantiate that in fact the Movant used the questioned funds for business and not to be a jet set traveler who spent these funds for personal use that the Government professes.

What was missed by not acquiring an expert was to create a highly negative interpretation of the Movant as well as his business activities. The fact is most of the funds were actually spent on payroll, interest expense and other business expenses, not personal expenses. Additionally, there were many 1099-div, brokage accounts, 1099-int banking interest, to document the substantial earnings activity of the business and that it was in fact an operating business.

This could have been substantiated by an outside forensic audit, which would have aided in the Movant receiving a sentence more related to his culpability. This would have cost around $5,000, a small price for counsels to cover based upon their fees of around $1 million. Not doing so, is without a doubt, ineffective assistance of counsel.

**GROUND 5-   Not Securing a Bail Bond was Ineffective Counsel**

In many cases, a bond is a necessity, otherwise a defendant is so restricted in the prison environment that he is unable to assist his counsel in properly understanding his case so he can properly assist him to regaining his personal freedom.

This case is one of those due to the complexities of the crime that it was critical to have the Movant available to assist trial counsel in properly presenting his case.

Additionally, there was additional situation, the COVID-19 virus. Since the prison conditions were ill equipped to meet all the challenges of the COVID-19 and as such THE CARES ACT was implemented by President Biden. This act allowed prisoners who were vulnerable to be released to home confinement.

Multiple federal courts addressed requests for release under these provisions of Section 3142 in light of COVID-19 concerns, considering factors including "(1) the original grounds for the defendant's pretrial detention, (2) the specificity of the Defendant's stated COVID-19 concerns, (3) the extent to the defendant, and (4) the likelihood that the defendant 's proposed release would increase COVID-19 risk to others." **United States v. Ryan,** No. 19-CR-756m 2020 WL 1861662, at * 2 (C.D. Cal. Apr. 14, 2020); **United States v. Boatwright,** No. 19-CR-2020 WL 1639855, at *(Nev. Apr 2, 2020).

The courts' responses to the requests have been mixed. However, in one case, the U.S. District Court for the Southern District of New York ruled both provisions of Section 3142 supported a defendant's release subject to conditions of home incarceration and electronic location monitoring. **United States v. Stephens,** No. 15-CR-0095, 2020 WL 1295155 at *1 (S.D.N.Y. Mar 19, 2020).

At the outset, the court viewed the "unprecedented and extraordinarily dangerous nature of the COVID-19 pandemic, "in conjunction with new information that had come to light about the defendant's dangerousness, as sufficiently changed circumstances bearing on risk to the community to necessitate reconsideration of detention **Id.** at *2.

And in light of those changed circumstances, the court determined that the weight of the evidence now clearly and convincingly tipped in favor of concluding that the defendant did not pose a danger to the community and should be conditionally released. **Id.**

The court also ruled that the impact of the COVID-19 outbreak on the Defendant's ability to prepare his defense constituted a "compelling reason" justifying temporary release under Section 3142 (i), noting that BOP's suspension of visits except on a case-by-case basis limited the defendant's access to his attorney. **Id.**

No question, medically, the Movant met the criteria because of his poor medical health. As noted in his motion for a downward departure, he has hypertension and enlarged heart as well as being over 50 years of age and as such, is in the vulnerable category as set down by CDC. Coupled with that is the well documented bad medical care provided by the Federal Prison system as well as their ability to properly meet the medical requirements of dealing with the COVID-19 virus.

Pursuant to THE CARES ACT, trial counsel should have attempted to file a motion for compassionate release due to his vulnerability. Not doing so is ineffective assistance of counsel.

## GROUND 6. Counsel Requested Consideration of Smerling's Conditions of Confinement and Efforts at Rehabilitation

The Government is correct that trial counsels did try obtain a downward departure and tried to get receive a reduced sentence for the Movant,

19

however, the Movant made many requests to ask for an additional sentence reduction due to the harsh conditions of COVID-19 and this was completely ignored by trial counsels. The fact is that due to the poor environment of the prison confines, the Movant did contact and was infected with the COVID-19 virus, which him fact more likely to again contact the virus and due to his medical conditions, had a possibility of even being fatal.

Trial counsels' downward variance arguments went astray due to them not properly following the Movant's requests. Yes, arguments were made at sentencing, but missing were some important factors.

In particular, Movant requested that his attorneys advocate for a downward variance relating to keeping him in pretrial detention which resulted in him missing First Step Act Credits that could have produced him a sentencing reduction.

Not properly advocating for your client, is on its face ineffective assistance of counsel. As note in ABA standard for **Criminal Defense,** 4th Edition (2017). In particular standard **4-3.7 Prompt and Through Actions to Protect the Client.** This section states the following:

(a) Many important rights of a criminal client can be protected and preserved by prompt legal action. Defense counsel should inform the client of his or her rights in the criminal process at the earliest opportunity, and timely plan and take necessary actions to vindicate such rights within the scope representation. This was not done at all in the instant case.

(b) Defense counsel should promptly seek to obtain and review all information relevant to the criminal matter, including but not limited to requesting materials from the prosecution. Defense should, when relevant, take prompt steps to ensure that the Government's physical evidence is preserved at least until the defense can examine or evaluate it. This was not done at all during the representation period of counsels.

(c) Defense should work diligently to develop, in consultation with the client, an investigative and legal defense strategy, including a theory of the case. As the matter progresses, counsel should refine or alter the theory of the case as necessary, and similarly adjust the investigative or defense strategy. This was not done by any of the trial counsels representing the Movant.

(d) Not all defense actions needed to be taken immediately. If counsel has evidence of innocence, mitigation, or other favorable information, defense counsel should discuss with the client and decide whether, going to the prosecution with such evidence is in the client's best interest, and if so, when and how. This was missed time and time again by all the trial counsels.

(e) Defense counsel should consider whether an opportunity to benefit from cooperation with the prosecution will be lost if not pursued quickly, and if so, promptly discuss with the client and decide whether such cooperation is in the client's interest. Counsel should timely act in accordance with such decisions. These opportunities were missed time and again by all the counsels.

(f) For each matter, defense counsel should consider what procedural and investigative steps to take and motions to file, and not simply follow rote procedures learned from prior matters. Defense counsel should not be deterred from sensible action merely because counsel has not previously seen a tactic used, or because such action might incur criticism or disfavor. Before acting, defense counsel should discuss novel or unfamiliar matters or issues with colleagues or other experienced counsel, employing safeguards to protect confidentiality and avoid conflicts of interest. This aspect was not applied by any of the counsels.

(g) Whether defense counsel is confronted with specialized factual or legal issues with which counsel is unfamiliar, counsel should, in addition to researching and learning about the issue personally, consider engaging or consulting with an expert in the specialized area. This was not done from the beginning of the representation since none of the counsel knew how to handle a whistleblower action.

(h) Defense counsel should always consider interlocutory appeals or collateral proceedings as one option in response to any materially adverse ruling.  This was totally missed by counsel.

It is obvious that trial counsels followed none of the factors listed above, in particular, section G, and as such, was ineffective in representing the Movant. The real issue was that trial counsels stayed the course and rather than properly advocate for the Movant and as such, he received a much larger sentence than expected.


**GROUND 7. Counsel Should Have Reviewed The PSR with Smerling**

Although the Government states in their response that the Movant did review the PSR is a falsehood. Although counsels' affidavits indicated that they reviewed the PSR with the Movant and had "discussed" the report, they never said he received report, which would be necessary to actually review report. The fact was not disputed by the Government in their response.

No question, the Presentence Investigative Report (PSR) is a critical part of the sentencing process. The defendant requires the guiding hand of counsel at every step of the proceedings against him. **Powell v. Alabama,** 287 U.S. 45, 69 (1932).

The PSR is an important step in the proceeding in terms of the consequences to the defendant. A defendant's conduct at the presentence interview can have a significant effect on the sentence recommendation in the presentence report, and district courts rely heaving on the contents of those reports... A single finding by the probation officer can significantly affect the ultimate sentencing range. **United States v. Herrera-Figuerora,** 918 F. 2d 1430, 1434 (9th Cir 1990).

The Supreme Court has identified a number of elements that must exist to order for a criminal proceeding to be deemed "critical." First, a critical stage must occur after the initiation of adversarial proceedings. **Kilby v. Illnois,**

408 U.S. 682, 688 (1972). Second, the defendant must confront either the prosecution or the procedural system. **Id.** at 689. Finally, the confrontation must involve the possibility that the accused's rights to a fair trial, or other proceeding, will be harmed if he is forced to proceed without. **United States v. Wade,** 388 U.S. 216, 288 (1967).

After the report has been completed, the next duty is to review said report with the defendant. The first draft of the report (often referred to as the "initial disclosure") is provided only to the attorney for the government and the attorney for the defendant. The defendant's attorney should have scheduled a time to provide to provide the defendant a copy of the report and review it with him/her. At this time, either attorney or the defendant may file objections to any information contained in the presentence report or he application of the sentencing guidelines to that information.

The problem in this case is that the Movant never received his PSR and as such was not able to read in detail what was in the report so he could combat it.  The fact is Federal Rule of Criminal Procedure 32 (e)(2) requires that the probation officer "must give the presentence report to the defendant, the defendant's attorney, and an attorney for the government at least thirty-five (35) days before sentencing unless the defendant waives this minimum period. "

In this case, no waiver occurred. In fact, all the attorneys in their rebuttals to ineffective counsel by the Movant, indicated the complete and detailed involvement of the Movant in this case.

Therefore, by not reviewing the PSR with the Movant, the Counsels' failed in their duty to provide proper assistance of counsel in a critical stage of the sentencing process. In fact, as noted in **Criminal Justice Standards for the Defense Function,** Fourth Edition (2017), American Bar Association, **Standard 4-1.5, Preserving the Record,** it states "At every stage of representation, defense counsel should take steps necessary to make a clear and complete record for potential review. Such steps include: filing motions, including motions for reconsideration, and exhibits; making

23

objections and placing explanations on the record; requesting evidentiary hearings, requesting or objecting to jury instructions; and making proofs and proffers of excluded evidence."

To no surprise, based on the representation of trial case in the instant case, none of this was ever done in any stage of their representation of the Movant.  That is ineffective counsel especially when one considers how critical the objections to the PSR are because on many occasions the determinations made by probation and the PSR if followed by the District Judge verbatim.

### Conclusion

Based on the evidence provided in his reply, the Movant requests that the Court vacate his sentence or whatever relief they deem necessary in the circumstances of this case.

Respectively submitted,

Elliot Smerling
#31881-509

**<u>Certificate of Service</u>**

   I hereby certify that a true copy of this motion was sent via the United States Postal Service to the following party of November 4, 2023.

Damian Williams
United States Attorney for the
Southern District of New York
1 Saint Andrews Plaza
New York, New York

Respectfully submitted,

Elliot Smerling
#31881-509

**Exhibit A**

C1

## CONTINUATION SHEET

1). Silicon Valley Bank
    3003 Tasman Drive
    Santa Clara CA 95054

2). Citizens Bank NA.
    One Citizens Plaza
    Providence RI 02903

3). PacWest Bancorp
    9701 Wilshire Blvd., Suite 700
    Beverly Hills CA 90212

4). Western Alliance Bank
    1 East Washington Street
    Phoenix AZ 85004

5). Signature Bank
    565 5th Avenue
    NY NY 10017

6). Square One Bank
    406 Blackwell Street, Suite 240
    Durham NC 27701

7). East-West Bank
    135 N. Los Robles Avenue, 7th Floor
    Pasadena CA 91101

8). Sumitomo Mitsui Bank
    277 Park Avenue
    NY NY 10172

9). UBS
    1285 Avenue of the Americas
    NY NY 10019

10). First Republic Bank
     101 Pine Street
     San Francisco CA 94111

PRIORITY
MAIL
EXPRESS®

FLAT RATE ■ ANY WEIGHT
ENVELOPE

PRESS FIRMLY TO SEAL

PRESS FIRMLY TO SEAL

To schedule free Package Pickup,
scan the QR code.

USPS.COM/PICKUP

UNITED STATES
POSTAL SERVICE®

PRIORITY
MAIL
EXPRESS®

This packaging is the property of the U.S. Postal Service and is provided solely for use in sending Priority Mail Express® shipments.

PME 2-Day
PEMBROKE PINES, FL 33027
NOV 04, 2023

$28.75

R2903S103195-13

10007

RDC 07

Retail

**CUSTOMER USE ONLY**

FROM: (PLEASE PRINT)   PHONE (    )
ELLIOT SMUKLER
FEDERAL PRISON COMP(?)
P.O. BOX 779800
MIAMI, FL 33177

**DELIVERY OPTIONS (Customer Use Only)**
☐ SIGNATURE REQUIRED

TO: (PLEASE PRINT)
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
ATT: CLERK OF THE COURT
DANIEL PATRICK MOYNIHAN COURTHOUSE
500 PEARL STREET Rm 230
New York, New York 10007

■ For pickup or USPS Tracking™, visit USPS.com or call 800-222-1811.
■ $100.00 insurance included.

PEEL FROM THIS CORNER

**PAYMENT (Item in an ACCOUNT if applicable)**

RECEIVED
NOV -7 2023
PRO SE OFFICE

PO ZIP Code   33007
Date Accepted (MM/DD/YY)   11-4-23
Time Accepted   01:30   ☐ AM   ☐ PM

Scheduled Delivery Date (MM/DD/YY)   11-7-23   $28.75

Military   ☐ DPO
Postage   $28.75
Insurance Fee    COD Fee
Return Receipt Fee    Live Animal Transportation Fee
Total Postage & Fees   $28.75

Acceptance Employee Initials

Weight   lbs.   ozs.   ☐ Flat Rate

**DELIVERY (POSTAL SERVICE USE ONLY)**
Delivery Attempt (MM/DD/YY)   Time   ☐ AM ☐ PM
Delivery Attempt (MM/DD/YY)   Time   ☐ AM ☐ PM
Employee Signature
Employee Signature

LABEL 11-B, MAY 2021   PSN 7690-02-000-9996

EP13F July 2022